AO 106 (Rev. 06/09)   Application for a Search Warrant

# UNITED STATES DISTRICT COURT

**FILED**

for the

Eastern District Of Missouri

FEB **2 4** 2020

U. S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

IN THE MATTER OF THE SEARCH OF THE )
PREMISES LOCATED AT: **8039 Airport Rd.,** )
**Berkeley, MO 63134** WITHIN THE EASTERN )
DISTRICT OF MISSOURI, MORE FULLY )
DESCRIBED IN ATTACHMENT A. )

Case No. 4:20 MJ 1043 JMB

## APPLICATION FOR A SEARCH WARRANT

I, ___Ikedinachi Akagha___, a federal law enforcement officer or an attorney for the government request a search warrant and state under penalty of perjury that I have reason to believe that on the following property:

### See Attachment A

located in the ___Eastern___ District of ___Missouri___, there is now concealed

### See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
  ✓ evidence of a crime;
  ✓ contraband, fruits of crime, or other items illegally possessed;
  ✓ property designed for use, intended for use, or used in committing a crime;
  ❑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| Title 21, U.S.C., 841(a)(1) | possess with intent to distribute controlled substance(s) |

The application is based on these facts:

SEE ATTACHED AFFIDAVIT WHICH IS INCORPORATED HEREIN BY REFERENCE.

  ✓   Continued on the attached sheet.
  ❑   Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Ikedinachi Akagha, Special Agent, FBI

**Sworn to before me and signed in my presence.**

Date: ___February 24, 2020___

_____
*Judge's signature*

City and State: ___St. Louis, MO___

Honorable John M. Bodenhausen, U.S. Magistrate Judge
*Printed name and title*
SAUSA: Nauman Wadalawala

**"NO KNOCK" ENTRY IS AUTHORIZED** _____

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI

IN THE MATTER OF THE SEARCH OF )
THE PREMISES LOCATED AT: **8039** )   No. 4:20 MJ 1043 JMB
**Airport Rd., Berkeley, MO 63134** WITHIN )
THE EASTERN DISTRICT OF MISSOURI, )
MORE FULLY DESCRIBED IN )   FILED UNDER SEAL
ATTACHMENT A. )

## AFFIDAVIT FOR NO KNOCK SEARCH WARRANT

I, Ikedinachi Akagha, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application under Rule 41 of the Federal Rules

of Criminal Procedure for a warrant to search the premises known as **8039 Airport Rd., Berkeley,**

**MO 63134**, further described in Attachment A, for the things described in Attachment B.

2.     I am a Special Agent with the Federal Bureau of Investigation, and have been since

May 31, 2015.  Prior to the FBI I served in the United States Air Force for approximately 6 years.

I am currently assigned to a squad responsible for the investigation of violent street gangs and drug

distribution.  During the course of my law enforcement experience I have participated in several

complex domestic investigations involving drug trafficking organizations dealing in cocaine,

methamphetamine, heroin, and other controlled substances.  I have also received training and

participated in investigations involving the interception of both wire communications and

electronic communications.

3.     The facts in this affidavit come from my personal observations, my training and

experience, and information obtained from other agents and witnesses. This affidavit is intended

to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 21, U.S. 841(a)(1) have been committed by DARION HOOD or other persons known and unknown.  There is also probable cause to search the information described in Attachment A for evidence of these crimes and contraband or fruits of these crimes, as described in Attachment B.

## LOCATION TO BE SEARCHED

5.      The property to be searched is the premises located at: **8039 Airport Rd., Berkeley, MO 63134**, (hereinafter referred to as **"Subject Property"**), further described as a single family residence with off white/yellow vinyl siding and gray shingled roof. The front door is located near the center of the residence. There is a car port attached to the west of the house when viewed from Airport Rd. The numbers "8039" are affixed to the mailbox attached to the right of the front door as you face the front of the house.

## INVESTIGATION AND PROBABLE CAUSE

6.      Beginning around October of 2019, members with the FBI and St. Louis County Police Department (SLCPD) received information from a confidential source (CS) regarding

2

DARION HOOD'S drug trafficking. According to the CS, DARION HOOD[1] was selling ounce

levels of fentanyl and had access to firearms. CS verified DARION HOOD from a photograph

shown to CS by investigators. To corroborate the information, investigators conducted a series of

controlled buys of suspected fentanyl and two firearms. It should be noted that a review of

HOOD'S criminal history revealed he is a convicted felon. Below is a summary of the controlled

narcotic and firearm transactions:

### November 13, 2019 – Controlled Purchase #1

7.      On or about November 13, 2019, members of the FBI Hybrid Task Force (HTF)

met with CS to conduct a controlled purchase of suspected fentanyl from DARION HOOD. Prior

to meeting with investigators, CS had already contacted HOOD through Facebook messenger

and by phone to arrange the narcotic transaction. At a secure location, CS placed a telephone call

to (314)924-0888, a number known to be used by DARION HOOD. HOOD instructed the CS to

proceed to the Big Top Flea Market located at 2505 Chambers Road. Physical surveillance was

established in the area of the Market.

8.      The CS was searched for contraband before the transaction which met with

negative results. CS was provided with $500 in U.S. currency. CS was driven by a SLCPD

undercover detective (UC) to the area of 2505 Chambers Road. Surveillance observed DARION

---

[1] Darion Hood's criminal history consists of felony convictions for receiving stolen property, 2nd degree burglary, Theft/Stealing, Forgery, and Possession of Drug Paraphernalia

HOOD walking towards a dark colored Buick sedan bearing Missouri temporary tag "04B1P0". After the CS arrived at 2505 Chambers Road and met with HOOD. The CS provided HOOD with $500 in exchange for what the CS knew to be fentanyl. The CS departed the area driven by the UC followed by members of the surveillance team. The CS met with investigators at a pre-determined location. CS provided investigators with a bag containing numerous capsules each containing suspected fentanyl. A search of the CS person was conducted for contraband which yielded negative results. The suspected fentanyl was transported to the evidence control room located at the FBI St. Louis office to be logged into evidence for storage. This evidence was not field-tested because of the potential presence of fentanyl. The drug evidence weighed approximately 10.1 grams.

### November 25, 2019 – Controlled Purchase #2

9.       On or about November 25, 2019, members of the FBI Hybrid Task Force (HTF) met with CS #1 to conduct a controlled purchase of suspected fentanyl from DARION HOOD. Prior to meeting with investigators, CS had already contacted HOOD through Facebook messenger and by phone to arrange the narcotic transaction. At a secure location, CS placed a telephone call to (314)924-0888, a number known to be used by DARION HOOD. HOOD told CS that he was waiting for his cousin to arrive. A couple minutes later, HOOD called the CS and directed CS to a McDonald's in 45 minutes. Shortly after, the CS received another call from HOOD. HOOD directed the CS to meet him at the intersection of Redman Boulevard and

4

Raymond Avenue. Physical surveillance was established in the area in anticipation of the controlled narcotic transaction.

10.     CS was searched for contraband prior to the deal which met with negative results. CS was provided with $500 to be used for the transaction. CS departed the staging location driven by a UC. After the CS and UC arrived in the area, they waited for HOOD for about 30 minutes. Surveillance observed HOOD in the passenger seat of a small Kia Sport Utility vehicle bearing Missouri license plate number TA1R8K. CS and HOOD both exited their respective vehicles to complete the hand to hand drug transaction. CS provided HOOD with $500 in exchange for what the CS knew to be fentanyl. After the transaction, CS entered the UC vehicle and HOOD entered the passenger seat of the Kia.     Members of the investigative team met with UC and CS at a secure location following the transaction. CS provided investigators with a bag containing numerous capsules of a powdery substances suspected to be fentanyl. The CS was searched for contraband which yielded negative results. The suspected fentanyl was seized and transported to the FBI office to be placed into evidence for storage. The evidence was not field-tested because of the potential presence of fentanyl. The drug evidence weighted approximately 11.3 grams.

### December 4, 2019 – Controlled Purchase #3

11.     On or about December 4, 2019, members of the FBI HTF used CS to purchase a firearm from HOOD. Under the direction of investigators, CS arranged to purchase a rifle from DARION HOOD for $500 prior to meeting at a secure location. CS and HOOD arranged the

5

transaction via Facebook Phone as well as through calls and text messages. CS knew hood to use the Facebook profile name "Hood Darion" and the telephone number (314)924-0888. CS and investigators met at a secure location. CS placed a telephone call to DARION HOOD at (314)924-0888. HOOD confirmed he was ready to meet to sell CS the firearm and directed CS to Airport Road. Members of the surveillance team established surveillance in the area of Airport Road. CS was searched for contraband prior to departing the secure location which yielded negative results. CS was provided with $500 to be used in the transaction. CS again telephoned HOOD. HOOD directed CS to the **Subject Property**. CS was driven by a UC to the **Subject Property**.

12.     HOOD was observed by members of the surveillance team exiting the **Subject Property** and walked to the undercover vehicle driven by the UC. CS exited the passenger seat of the UC vehicle and entered the rear passenger seat of the same vehicle. HOOD entered the passenger front seat of the UC vehicle. While inside the vehicle with the CS and UC, the UC provided HOOD with $500 in exchange for a gun. Physical surveillance observed a black male, later identified as ANTONIOUS BOLDIEN[2] standing outside the **Subject Property** during the exchange. Following the exchange, HOOD exited the UC vehicle and re-entered **Subject Property.** CS departed the area driven by the UC to a secure location. CS and UC met with

---

[2] Ameren records revealed that ANTONIOUS BOLDIEN is currently paying utilities at subject property.

6

investigators at the secure location. UC provided investigator with a Kel-Tec 9mm carbine, Model: S2000, which contained a magazine. CS was searched for contraband which yielded negative results. The firearm was seized, made safe, and transported to the FBI to be placed into evidence.

### December 17, 2019 – Controlled Purchase #4

13.       On or about December 17, 2019, members of the FBI HTF met with CS to conduct a controlled purchase of suspected fentanyl from DARION HOOD. Prior to meeting with investigators, CS had already contacted HOOD by calling him at (314)924-0888 to arrange the narcotic transaction. At a secure location, CS placed a telephone call to (314)924-0888, a number known to be used by DARION HOOD. HOOD advised he was in the area of Page Avenue and Kingshighway Boulevard. Prior to departing the secure location, CS was searched for contraband which yielded negative results. CS was provided with $500 to be used for the narcotic transaction. CS was driven by a UC to the area of Page Avenue and Kingshighway Boulevard followed by members of the surveillance team. CS telephoned HOOD at (314)9244-0888 when CS and UC were in the area. HOOD directed CS to the AutoZone. Surveillance observed CS arrive at the AutoZone located on 1215 North Kingshighway Boulevard. CS exited the UC vehicle and approached HOOD. The CS followed HOOD behind the AutoZone. While

7

behind the AutoZone, CS provided HOOD with $500 in exchange for what the CS knew to be fentanyl.

14.     Following the transaction, the CS and hood walked back to their respective vehicles. CS was driven by a UC to a secure location. HOOD was observed entering the passenger seat of tan/gold colored Honda Accord bearing Missouri license plate number KR8H4G. The vehicle appeared to be driven by a female and children were in the rear passenger seat. After arriving at the secure location, CS provided investigators with a clear plastic bag containing a powdered substance suspected to be fentanyl. The CS was searched for contraband by investigators which yielded negative results. The suspected fentanyl was transported to the FBI office to be places into storage. The suspected fentanyl weighed approximately 6.6 grams.

### January 15, 2020 – Controlled Purchase #5

15.     On or about January 15, 2020, members of the FBI HTF met with CS #1 in anticipation of a conducting a controlled purchase of suspected fentanyl from DARION HOOD. Prior to meeting with investigators, CS already contacted HOOD by calling him at a new number CS knew HOOD to be using to arrange narcotic transaction. CS had telephoned (618) 467-8478 to arrange the transaction with HOOD.

16.     Members of the surveillance team established in the area of the **Subject Property.** At a secure location, CS placed a telephone call to HOOD at (618) 467-8478, a number known to be used by HOOD. HOOD directed CS to **Subject Property** to meet for the transaction. CS was searched for contraband which yielded negative results. CS was then

8

provided with $500 to be used for the purchase of fentanyl. CS was driven by a UC to the **Subject Property.** Shortly after the UC and CS arrived at **Subject Property,** HOOD was observed driving the same tan/gold Honda Accord bearing Missouri license plate number KR8H4G. DARION HOOD[3] conducted a hand-to-hand transaction with CS. Following the transaction CS departed the **Subject Property** driven by the UC. CS met with investigators at a secure location. While at the secure location, CS provided two clear plastic bags containing suspected fentanyl to investigators. CS was searched for contraband which yielded negative results. The suspected fentanyl was transported to the FBI to be placed into evidence. The evidence was not field-tested because of the suspected presence of fentanyl. The suspected fentanyl weighted approximately 10.0 grams.

### January 30, 2020 – Controlled Purchase #6

17.     On or about January 30, 2020, members of the FBI HTF met with CS #1 conducted a controlled purchase of a firearm from DARION HOOD. Under the direction of investigators, CS contacted HOOD through calls and text at (314)924-0888 to arrange to purchase a firearm. HOOD directed CS to meet at **Subject Property** for the exchange**.** Members of the surveillance team established surveillance in the area of **Subject Property** to observe HOOD's and associates' activity from the residence. Surveillance observed the same tan/gold

---

[3] It should be noted the surveillance units observed HOOD depart the **Subject Property**, after the hand to hand transaction, and drive to Little Steps Daycare to pick up a small child.

Honda bearing Missouri license plate number KR8H4G arrive at 8039 Airport Road. HOOD and an unknown black female were observed going back and forth between the vehicle and the **Subject Property** several times carrying clothes as well as a bag.

18.     At the secure location, CS was searched for contraband which yielded negative results. CS was provided with $1,000 and an empty black bag to be used for the purchase of a firearm. CS was driven by a UC to **Subject Property.** After arriving at the **Subject Property,** CS exited the UC vehicle and entered the **Subject Property.** The CS provided HOOD with $1,000 in exchange for a firearm and ammunition while inside **Subject Property**. The firearm was placed in the bag and the CS exited **Subject Property** and entered the passenger seat of the UC vehicle. The CS was driven to a secure location by the UC. At the secure location, CS met with investigator and provided them with the bag that contained one Radical Firearms AR-15 which contained a magazine with 30 rounds of 5.56 ammunition and a Strike Fire scope. Investigators searched the CS for contraband which yielded negative results.  The firearm was seized, rendered safe, securely transported to the evidence control room located at the FBI St. Louis main office to be logged into evidence.

### February 19, 2020 – Controlled Purchase #7

19.     On or about February 19, 2020, members of the FBI HTF met with CS conducted a controlled purchase of a fentanyl from DARION HOOD. Under the direction of investigators,

10

CS contacted HOOD through calls and text at (314)924-0888 to arrange to purchase of fentanyl. HOOD directed CS to meet at **Subject Property** for the exchange**.**

20.     Members of the surveillance team established surveillance in the area of **Subject Property** to observe HOOD's and associates' activity from the residence. Surveillance observed the same tan/gold Honda bearing Missouri license plate number KR8H4G occupied by HOOD at 8039 Airport Road.

21.     At the secure location, CS was searched for contraband which yielded negative results. CS was provided with $1,100 to be used for the purchase of fentanyl and a firearm. CS was driven by a UC to **Subject Property.** After arriving at the **Subject Property,** CS exited the UC vehicle and entered the tan/gold Honda bearing Missouri license plate number KR8H4G**.** The CS provided HOOD with $400 of the $1,100 in exchange for fentanyl as HOOD did not have a firearm to sell. During the post-operation debrief, CS disclosed that they inquired about going inside the **Subject Property**, but HOOD declined and conveyed to the CS that others were "handling business" inside the **Subject Property**. CS and investigators understood this to be coded language suggesting that more fentanyl or other illicit drugs were being cut and packaged for distribution. The suspected fentanyl was transported to the FBI to be placed into evidence and the remaining $700 was relinquished to investigators. The evidence was not field-tested because of

11

the suspected presence of fentanyl, but was tested with a Thermo Scientific™ TruNarc™ Analyzer. The suspected fentanyl weighted approximately 8.1 grams.

22.    A confidential source (CS) has supplied information to law enforcement on multiple occasions concerning the underlying investigation in this case.[4]  The CS's information has proven accurate and reliable on multiple occasions, and is often quite detailed.  Information supplied by the CS has been corroborated through traditional investigative techniques such as physical surveillance observations and interviews of related parties.  Additionally, information supplied by the CS has been corroborated through reviews of recordings (by law enforcement officials) made by the CS during meetings described in this Affidavit.  Based upon discussions with fellow law enforcement personnel and my personal observations and experience, information supplied by the CS has been reliable and accurate and can be regarded as such.

23.    Based on the investigative teams observations, and discussion with other law enforcement agents, information supplied by the CS can be regarded as information which, if disclosed among criminal suspects, would likely reveal the CS's role as a cooperator, because only a limited set of people know the information the CS has disclosed to authorities.  It is my assessment, as well as that law enforcement officers directly dealing with the CS that the CS's life

---

[4]    CS has provided reliable information to the FBI and SLCPD for approximately three months. CS has a criminal history that includes credit card fraud and theft. The information provided by CS has proven to be reliable, and investigators have verified the information by conducting physical surveillance, controlled purchases, conducting consensually recorded conversations and reviewing criminal histories. CS has been cooperating with law enforcement in exchange for monetary compensation.

12

and safety (and CS's family, whether in the United States or elsewhere) could be jeopardized through violent retaliation should the CS's role as a cooperator become public prematurely.

## BACKGROUND AND TRAINING

24.     As part of my experience and training and that of other law enforcement officers participating in the investigation, we have accumulated information and training in the areas of narcotics based economic crime. I have had extensive experience, as have other members of the investigating team, in interviewing defendants, witnesses, informants and others who have experience in the gathering, spending, converting, transporting, distributing and concealing of proceeds of narcotics trafficking. Based upon my and the investigating team's experience and our participation in other pending and completed controlled substances and/or financial investigations involving ongoing, extensive distribution conspiracies involving large amounts of controlled substances and money, I am informed of the following:

a.     It is common for drug dealers to secrete contraband, proceeds of drug sales, and records of drug transactions in their residence or other buildings under their control.

b.     Drug traffickers frequently keep near at hand, in their residence or other buildings under their control, paraphernalia for packaging, cutting, weighing and distributing of controlled substances. These paraphernalia include, but are not limited to scales, plastic bags, and cutting agents.

c.     Drug traffickers maintain books, records, receipts, notes, ledgers, airline tickets, computer hard drives and disk records, money orders and other papers relating to the

transportation, ordering, sale and distribution of controlled substances. Drug traffickers commonly "front" (provide drugs on consignment) controlled substances to their clients. The aforementioned books, records, receipts, notes, ledgers, etc. are maintained where the drug traffickers have ready access to them, specifically in their residence or in other buildings under their control.

      d.      Drug traffickers commonly maintain telephone bills, invoices, packaging, cellular batteries and/or charging devices, cancelled checks or receipts for telephone purchase/service; cellular and/or landline telephones; digital and/or alphanumeric text (two-way) pagers; computers capable of e-mail and/or chat-room communication, answering machines; address and/or telephone books and papers reflecting names, addresses, and/or telephone numbers of sources of supply, of customers, and/or evidencing association in fact with  persons known to traffic in controlled substances or to facilitate such trafficking. These records are maintained where drug traffickers have ready access to them, specifically, in their residence or in other buildings under their control.

      e.      Drug traffickers take or cause to be taken photographs of them, their associates, their property, cash and currency, firearms, and controlled substances. These traffickers frequently maintain these photographs in their residence or other buildings under their control.

      f.      Persons involved in large-scale drug trafficking conceal in their residence or other buildings under their control large amounts of currency, precious metals, jewelry, and financial instruments, including, but not limited to, stocks and bonds, papers, titles, deeds and other

14

documents reflecting ownership of vehicles and property utilized in the distribution of controlled substances or which are proceeds from the distribution of controlled substances.

g.      When drug traffickers amass large proceeds from the sale of controlled substances they attempt to legitimize these profits. I know that to accomplish these goals, drug traffickers utilize financial institutions, including but not limited to, foreign and domestic banks and their attendant services, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate, shell corporations and business fronts. They maintain record of these transactions in their residence or other buildings under their control.

h.      It is common for drug traffickers to travel to major distribution centers, such as Texas, California and/or Mexico to purchase controlled substances and/or to arrange for its distribution elsewhere in the United States. After purchasing controlled substances, these drug traffickers will transport or cause to be transported, controlled substances to the areas in which they will distribute the controlled substances. The methods of transportation include, but are not limited to, commercial airlines, private airlines, rental automobiles, private automobiles, and government and contract mail carriers. Records of travel are frequently kept in their residence or other buildings under their control.

i.      Evidence of occupancy and residence including, but not limited to utility and telephone bills, canceled envelopes, rental or lease agreements, and keys, is relevant evidence in controlled substances prosecutions.

15

j.     Drug traffickers frequently possess firearms and/or other weapons in their residence or other buildings under their control to protect their cocaine and/or United States currency.

## REQUEST FOR NO KNOCK AUTHORITY

25.     This affiant specifically requests that the Court authorize the executing law enforcement officers to forego the requirement to "knock-and-announce" their presence prior to making entry into the Premises. The circumstances supporting this request are described as follows.

26.     Based on the facts and circumstances discussed in this Affidavit, among other things, there is a significant threat to officer safety and the safety of other persons present at the Premises. In other words, investigators believe that there is a substantial likelihood of a violent confrontation should the search warrant team be required to knock and announce their presence at the time of the execution of the search warrant.

27.     Investigators have been building their case against HOOD based on CS information about HOOD's access and trafficking of fentanyl and illegally obtained firearms. Investigators have corroborated this information through consensually monitored phone calls and texts, authorized illegal purchases of fentanyl at the direction of investigators, and authorized illegal purchases of firearms at the direction of investigators.

28.     HOOD has been observed selling fentanyl and firearms. UC observed a firearm on HOOD's person during a firearm transaction where a rifle was purchased and HOOD brandished

16

a Glock pistol and conveyed to the UC that he was attempting to sell it. CS has conveyed to investigators that HOOD is always armed during gun and fentanyl transactions. In this affiant's investigative experience, drug dealers are known to carry firearms on their person regularly to protect themselves from rival dealers, users with violent tendencies, robbers who target drug dealers, and even for use against law enforcement officers and agents. These firearms are used to protect themselves, their supply of drugs, and the financial proceeds from drug trafficking. The danger of presence as well as HOOD's access to firearms is further heightened by his access to firearms. HOOD regularly surrounds himself with co-conspirators who provide him with firearms to sell and supply fentanyl as well. These co-conspirators who frequent the **Subject Property** are suspected of keeping firearms on their person and CS provided information that various firearms are kept within the premises. Furthermore, the CS and UC have witnessed firearms on HOOD's person during drug and firearm purchases.

29.     HOOD is currently wanted by for failure to appear on account of a traffic related offense. Per criminal records checks, HOOD has a caution statement indicating that he should be considered armed and dangerous.

30.     Based on the facts and circumstances discussed in this Affidavit, among other things, this affiant further believes that the knock-and-announce requirement, would be futile or otherwise inhibit the investigation of the crime. Aside from the danger presented to law enforcement by the presence of firearms within the **Subject Property**, affiant's experience has shown that subjects of drug investigations will attempt to dispose of any incriminating evidence

17

present on the premises when they have been alerted to the presence and pending entry of law enforcement.

31.     Your affiant believes that the totality of the investigation creates a substantial likelihood of violent confrontation and/or otherwise inhibits the investigation of the subject offenses should the search warrant team be required to knock and announce their presence at the time of the execution of the warrants. For these reasons, your affiant specifically requests that the Court authorize the search warrant teams to enter the Premises without first knocking and announcing their presence, and at any time, day or night.

## **CONCLUSION**

32.     Based on the foregoing I submit that this affidavit supports probable cause for a warrant to search the Premises described in Attachment A and seize the items described in Attachment B.

33.     I further request that the Court order that all papers in support of this application, including the affidavit and warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee/continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

Respectfully submitted,

18

Ikedinachi Akagha
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on _____ February, 2020

_____
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

19

## **ATTACHMENT A**

*Property to be searched*

The property to be searched is the premises located at: **8039 Airport Rd., Berkeley, MO 63134**, further described as a single family residence with off white/yellow vinyl siding and gray shingled roof. The front door is located near the center of the residence. There is a car port attached to the west of the house when viewed from Airport Rd. The numbers "8039" are affixed to the mailbox attached to the right of the front door as you face the front of the house.



## ATTACHMENT B

*Property to be seized*

1.      All records and information relating violations of Title 21, U.S. 841(a)(1), conspiracy to distribute fentanyl, that constitutes fruits, evidence and instrumentalities of violations those violations involving **DARION HOOD**, including:

   a.  Fentanyl, heroin, and other controlled substances;

   b.  Paraphernalia for packaging, cutting, weighing and distributing controlled substances, including, but not limited to, scales, baggies and spoons;

   c.  Books, records, receipts, notes, ledgers, computer hard-drives and disk records, and other papers relating to the transportation, ordering, purchasing and distribution of controlled substances and/or firearms;

   d.  Telephone bills, invoices, packaging, cellular batteries and/or charging devices, cancelled checks or receipts for telephone purchase/service;

   e.  Digital and/or alphanumeric text (two-way) pagers; computers capable of e-mail and/or chat-room and/or digital communication, answering machines; address and/or telephone books and papers reflecting names, addresses, and/or telephone numbers of sources of supply, of customers, and/or evidencing association with persons known to traffic in controlled substances or to facilitate such trafficking;

   f.  Photographs, in particular photographs of co-conspirators, assets and/or controlled substances;

   g.  United States currency, precious metals, jewelry, and financial instruments, including, but not limited to, stocks and bonds, papers, titles, deeds and other

documents reflecting ownership of vehicles and property utilized in the distribution of controlled substances or which are proceeds from the distribution of controlled substances;

h.  Books, records, receipts, pay stubs, employment records, bank statements and records, money drafts, letters of credit, money order and cashier's checks receipts, passbooks, bank checks and other items evidencing the obtaining, secreting, transfer and/or concealment of assets and the obtaining, secreting, transfer, concealment and/or expenditure of money;

i.  Papers, tickets, notes, schedules, receipts and other items relating to travel, including, but not limited to, travel to and from St. Louis, Missouri and elsewhere;

j.  Indicia of occupancy, residency, rental and/or ownership of the vehicles and/or premises described above, including, but not limited to, utility and telephone bills, cancelled envelopes, rental or lease agreements and keys; and

k.  Firearms and/or weapons.

2